IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 13, 2013

## LOUIS MAYES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County
No. 06-04104    Chris Craft, Judge**

_____

**No. W2013-00614-CCA-MR3-CO  - Filed November 21, 2013**

_____

In 2006, the Petitioner, Louis Mayes, was convicted of first degree premeditated murder. The trial court sentenced him to life in prison.  This Court affirmed the Petitioner's convictions on appeal.  *State v. Louis Mayes*, No. W2007-02483-CCA-R3-CD, 2009 WL 1312629, at *1 (Tenn. Crim. App. May 11, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009). In 2013, the Petitioner filed a petition for a writ of error coram nobis in which he presented multiple claims, including his right to a hearing to present newly discovered evidence.  The coram nobis court summarily dismissed the petition on the basis that the petition was time-barred.  On appeal, the Petitioner alleges that the coram nobis court erred when it dismissed his petition, contending that the newly discovered evidence warrants a waiver of the statute of limitations.  After a thorough review of the record and applicable authorities, we affirm the coram nobis court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Louis Mayes,  Henning, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; and Amy P. Weirich, District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Background and Direct Appeal

In our opinion in the Petitioner's direct appeal of his conviction, we summarized the

facts presented at trial as follows:

Cynthia Wallace, the victim's mother, testified that on August 7, 2005, at approximately 9:30 p.m., her son, Christopher Wallace, "sounded frantic on the phone" when he called her to come and pick him up. She told Wallace to call her back later if he still needed a ride because she was preparing his sisters for bed. She did not hear from her son again that night. The next day, she was called to a crime scene where she confirmed that the body lying face down on the ground was Christopher Wallace.

Kittrel Robinson, an officer with the Memphis Police Department, testified that on the night of the offense he was the first officer to respond to a "man down call" located at 595 Alice. Upon arrival, he found a black male lying unresponsive in the front yard with "an open wound, like a gunshot wound, in his back" and a cordless telephone in his hand. Officer Robinson noticed a trail of "blood specks" on the ground which he followed eastward to a white house that he later secured as part of the crime scene.

Willie Miles, a crime scene investigator with the Memphis Police Department, testified regarding various photographs and a cordless phone that was found at the scene, all of which were admitted into evidence. On cross-examination, Investigator Miles testified that there was no physical evidence found at the scene that linked [the Petitioner] to the crime.

Auriel Elion, the victim's girlfriend, testified that on the night of the offense, she walked to a nearby neighborhood with the victim and Robert Beecham where they encountered [the Petitioner], Lonzie Carter, and a third man named Pancho. Carter, also known as "Mookie," was Beecham's cousin. Elion testified that the victim "exchang[ed] status" with the three men with gang handshakes. Elion explained that "exchanging status" meant "let[ting] them know who's the highest" rank in the Traveling Vice Lords. Elion testified that after the group exchanged status, Pancho "asked [the victim] who gave him his rank and [the victim] told him and ... [Pancho] was like, well, he can't give you any rank." An argument ensued, and Elion repeatedly requested the victim to walk to the store with her. When the victim refused, Elion left him with the men and walked to the corner store. Elion returned from the store and saw the victim without his shirt on, "hollering some words" and "very upset." None of the men explained to her why they were arguing.

After Elion arrived home, she noticed that the victim had called her at

9:40 p.m. When she returned his call, the victim stated that he was "fixing to go down there and kill all them . . . because . . . they thought he was false flagging." Elion explained that "false flagging" was "representing something that you're not." Despite Elion's attempts to calm the victim, he repeated his prior threat but added, "especially that [Carter], because he was claiming [Gangster Disciples] in middle school." Elion testified that their conversation ended when the victim said, "[M]y [friends are] already on Lauderdale. They [are] on [their] way."

Elion testified that she spoke with [the Petitioner] in a later phone conversation that night. She said that [the Petitioner] wanted to know where the victim lived and also wanted her to tell the victim that "[they did not] want no trouble. [They] just want[ed] peace." Elion testified that after this conversation, she was outside when Carter, Pancho, and [the Petitioner] "pulled down" in a white Grand Am. One of them asked for Beecham and then asked whether the victim lived at her house. Elion told them that the victim did not stay with her. She observed Beecham get into the white Grand Am with the other men, and they drove away. Elion stated she went to bed.

Elion next explained that her father asked if she had heard two gunshots and that she said, "[N]o." She and her brother stepped outside and saw a white Grand Am speeding down the street. Elion testified that she and her brother walked down the street to check on the victim at his house. When they arrived, the victim was not at home, but the lights and radio were on and the door was open. Elion knew "something was wrong" because "[the victim] never goes anywhere without his cigarettes and they were on the back of the couch." As Elion and her brother were returning home, Beecham approached them and said, "[D]on't go back around there . . . . because they shot at [the victim] and [the victim] . . . ran behind one of them houses. . . ."

The next morning, Elion's father told her that someone was found dead in the yard around the corner. Elion went to the scene, recognized the victim's body, and later provided two statements to the police. She explained that everything in the first statement was true, but she left out things because she was afraid. She identified [the Petitioner] in court and from a photospread as one of the individuals who came to her house looking for the victim. Elion testified that there were "about eight minutes" between the time that the men left her house looking for the victim and when she was asked by her father if she had heard any gunshots.

On cross-examination, Elion confirmed that the victim was a member of the Traveling Vice Lords who, although she could not explain what it meant, held rank or status as a "three star MOL." Elion reaffirmed her direct testimony; however, when asked whether the victim said that "he was going to shoot [Carter] in his face," Elion said, "Yes, sir." Elion also admitted that at a prior hearing she testified that she never saw [the Petitioner] after their phone conversation that night.

Robert Beecham testified that the victim, Carter, and [the Petitioner] were involved in an argument concerning gang rank on the night of the offense. Later that evening, while at Elion's house, Beecham overheard a telephone conversation between Elion and the victim. During the conversation, the victim said that "[h]e [was] fixing to go get his-some of his friends and go back to the house and shoot the house up." Beecham telephoned Carter, who was also his cousin, and "told them to be careful and go in the house because [the victim] said he [was] going to come back around there and shoot the house up." Beecham confirmed that Carter, [the Petitioner], Pancho, and Louis Blayde, the driver of the white Grand Am, came to Elion's house. Carter asked Beecham to get in the vehicle with them. Beecham testified that Pancho sat in the front passenger's seat while he sat in the back seat with [the Petitioner] and Carter. Beecham was on the driver's side, [the Petitioner] was on the passenger's side, and Carter sat between them. Beecham testified that all the men in the vehicle were members of a gang, the "Vice Lords," but he was not. The day of the offense was the first time that Beecham had met the other men in the vehicle.

Beecham testified that they drove down Alice Street and saw the victim standing on the sidewalk talking on the phone. Carter and [the Petitioner] jumped out of the vehicle. Beecham stated that Carter was armed with "a black sawed off [shotgun] wrapped in tape." Beecham could not recall what type of weapon [the Petitioner] had but knew it was a handgun. Beecham heard [the Petitioner] tell the victim not to run, but the victim began to run from the two men. Beecham testified that he heard two shots from [the Petitioner's] handgun. When asked about the shotgun, Beecham stated, "It didn't never go off." After the shooting, Beecham said the two men got back in the vehicle. Beecham walked back to Elion's house and did not see the other men again that night. He stated, "Really, I didn't know if [the victim] had been hit or not, you know. I told [Elion] and them, don't go around there. You know, a bullet don't have no name on it. . . ."

-4-

Beecham stated that he gave two statements to the police regarding the shooting. He admitted that he did not tell the truth the first time he gave a statement because he was "terrified. [He had] seen what the Vice Lords were capable of doing. So [he did not] want to end up the same way." After everyone involved was arrested, Beecham told the truth in a second statement to the police because he felt that he and his family were no longer in danger. However, Beecham identified [the Petitioner] and Carter from a photospread both times he was interviewed by the police. Beecham confirmed that he circled a photo of [the Petitioner] from a photospread and wrote, "this is Knockout who shot two times."

On cross-examination, Beecham testified that he did not know that [the Petitioner] and Carter were armed with weapons "until [he] got in the car and . . . took off." Beecham stated that he was not a member of a gang and "didn't know exactly what was going on. [The men] didn't tell [him] what they was fixing to do." Beecham entered the vehicle because of his cousin, Carter. Beecham explained that Carter was carrying the shotgun that did not fire. He admitted that he did not mention to the police in his first statement that he was in the car with [the Petitioner] and Carter, that [the Petitioner] and Carter had weapons, or that [the Petitioner] shot at the victim. Beecham stated that he did not make any deals with the prosecution in exchange for his testimony against [the Petitioner].

Louis Blayde, an ex-gang member, testified that he knew [the Petitioner] by his alias, "Knockout." Blayde stated that in August of 2005, he was a "foot soldier" for the Vice Lords with no rank. Blayde explained that [the Petitioner] held rank as a "Three Star Universal Elite" which, under gang rules, meant that Blayde had to do whatever [the Petitioner] said. Blayde also knew Pancho, another Vice Lord, who held rank as a "Five Star Branch Elite." Blayde explained that [the Petitioner] held a higher rank than Pancho. He stated that he met Beecham and Carter, known to him only as "Mookie," for the first time on the night of the offense and that Beecham was not a member of the Traveling Vice Lords.

Blayde stated that, on the night of the offense, [the Petitioner] and Pancho asked him to drive them around because they were about to put the victim in "V" or "violation." To put someone in "violation" was not clearly defined at trial; however, Blayde explained that he believed they were only going to give the victim a "beat down." Blayde confirmed that he drove a white Pontiac Grand Am. Blayde said that [the Petitioner], Pancho, Carter and

Beecham were in his vehicle with him on the night of the offense. Blayde stated that he did not see [the Petitioner] or Carter carrying any weapons until after Beecham had entered the vehicle. He observed [the Petitioner] with a handgun and Carter with a "gauge" or a shotgun. They drove to Alice Street and saw the victim on the sidewalk talking on the phone. Blayde stated that [the Petitioner] and Carter jumped out of the vehicle and told the victim not to run. The victim ran, and Blayde heard two gunshots. Blayde testified that after the shooting, [the Petitioner] and Carter returned to the car, and [the Petitioner] said, "I shot him." They drove off and separated. Blayde turned himself in to the police on August 18, 2005, after he learned that they were looking for him. While talking to detectives, he identified [the Petitioner] and Carter as being involved with the shooting.

On cross-examination, Blayde admitted that he did not tell the police or testify at a prior hearing that "they were going to put [the victim] in violation" because he was afraid. He did not have any "promises or deals" with the prosecution in exchange for his testimony against [the Petitioner].

Dr. Kenneth Snell, a forensic pathologist, testified that the victim died as a result of a distant gunshot wound to the right mid-back; however, the projectile exited the victim's body on the right front chest. He stated that his findings were consistent with the victim being "bent over and running at the time he was shot." Dr. Snell roughly estimated that the victim died around midnight.

Vivian Massey, an officer with the Shelby County Sheriff's Department Gang Unit, testified that [the Petitioner] told her that he had been affiliated with the Traveling Vice Lords since the age of nine. In addition, [the Petitioner] told Officer Massey that he was known as "Monster" or "Knockout," he was a member of the "Unknown Vice Lords," and he held rank as a "Five Star Universal Elite."

[The Petitioner] presented no proof at trial.

*Mayes*, 2009 WL 1312629, at *1-5.

Based upon this evidence, the jury convicted the Petitioner of first degree premeditated murder. *Id.* at *1. The trial court imposed a life sentence. *Id.* On appeal, this Court concluded that the evidence presented was sufficient to sustain the Petitioner's convictions. *Id.* at *7.

## B. Writ of Error Coram Nobis

In January 2013, the Petitioner filed a petition for a writ of error coram nobis. The Petitioner alleged that a report from the U.S. Department of Justice concerning the Shelby County Juvenile Court System was newly discovered evidence that would have led to a different result in his case. The Petitioner asserted that he was without fault for filing his petition outside the statute of limitations because the report had not been published at the time his petition would have been timely. The Petitioner alleged that the newly discovered evidence would show that his "due process rights . . . were violated" when he was charged with juvenile offenses and that his case would have "been remanded back to the [juvenile court] to [allow him to] be properly arraigned with a proper [a]djudicatory [h]earing." The trial court dismissed the petition for writ of error coram nobis as not timely filed. The trial court further held that, as to the Petitioner's allegation that the statutory limitation period should be waived on due process grounds, the Petitioner had not provided "newly discovered evidence which might have led to a different result at his trial."

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for a writ of error coram nobis because he presented newly discovered evidence, which he alleges the trial court "misunderstood[.]" He contends that the Justice Department's report details the fact that juveniles were "denied their [d]ue [p]rocess [r]ights to be put on notice as to the charges they were facing[,]" and that, had the Petitioner been put on notice at his detention hearing in juvenile court, he would have called a witness to testify and the "outcome of the proceedings would have been different." The State responds that the Petitioner has not demonstrated he is entitled to coram nobis relief. As to the Petitioner's argument that the statute of limitation should be waived, the State argues that the Justice Department's report does not constitute newly discovered evidence and that the Petitioner has not shown how the report has any bearing on the outcome of his case. The State also contends that the petition is time-barred by the one-year statute of limitation.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2012). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence, (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time, and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case." *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *6 (Tenn. Crim. App. Dec. 13, 2006). A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

Coram nobis claims are subject to a one-year statute of limitations that is computed

from the date the judgment of the trial court becomes final.  T.C.A. § 27-7-103 (2009); *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999).  The State bears the burden of raising the bar of the statute of limitations as an affirmative defense.  *Harris*, 102 S.W.3d at 593.  Due process considerations may toll the statute of limitations applicable to coram nobis petitions. *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001).  To determine whether due process requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims.  *Id.* at 103.  In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
>
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995).  Whether due process requires tolling of the limitations period is a mixed question of law and fact, which this Court reviews *de novo* with no presumption of correctness.  *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

In this case, the State contends that the Petitioner's petition is time barred.  The Petitioner's one-year statute of limitations began to run when his judgment became final, thirty days after September 17, 2007.[1]  This Court affirmed his judgment on May 11, 2009, and the Tennessee Supreme Court denied the Petitioner permission to appeal on October 19, 2009.  The Petitioner filed his petition for a writ of error coram nobis on January 23, 2013, which is well beyond the one-year statute of limitations.  We conclude that the Petitioner's petition for a writ of error coram nobis is time-barred.

We next turn to the Petitioner's argument that due process requires a tolling of the limitations period.  Our Supreme Court outlined the procedure that a trial court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity.  If the defendant is "without fault"

---

[1]The judgment against the Petitioner is not contained in the record; we rely on the Petitioner's filing in the coram nobis court, which states that his judgment became final on October 17, 2007, thirty days after his motion for new trial was denied.  *See* T.C.A. § 27-7-103 (2009).

-9-

in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" *Id.* (quotations omitted). There are, however, limits to the types of evidence that may warrant the issuance of a writ of error coram nobis. *See, e.g., State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). Aside from the fact that the evidence must be both admissible and material to the issues raised in the petition,

> [a]s a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial will not justify the granting of a petition . . . when the evidence . . . would not have resulted in a different judgment.

*Id.* (citations omitted).

The Petitioner, in his brief, states that the newly discovered evidence is the Justice Department's report on the Shelby County Juvenile Justice system, which "found that the [j]uvenile courts were deficient and violated [juveniles'] due process rights by not giving petitions to children at detention hearings." He further asserts his belief that, had he been put on notice of the charges against him prior to his detention hearing, he would have provided proof of his innocence, and thus, the outcome of his trial would have been different. We respectfully disagree. As the State notes, the Petitioner asserts a general argument that the outcome of his trial would have been different, without alleging any specifics, and thus fails to allege any reasonable basis for the coram nobis court to conclude that had the evidence been presented at trial, the result would have been different. The State also points out that the report found only a pattern of lack of written notice and that the same does not constitute new evidence, rather, it is a finding of prior conduct of the juvenile court system as a whole. We agree with the State and hold that the Petitioner has neither shown how the report is newly discovered evidence relevant to his case, nor has he shown that it would have had any bearing on the outcome of his trial. The trial court did not, therefore, err when it summarily dismissed the petition for a writ of error coram nobis. Accordingly, the Petitioner is not entitled to relief.

## II.  Conclusion

After a thorough review of the record and the applicable law, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE